# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

GRAPHIC PACKAGING INT'L, INC.,

    Plaintiff,

v.                                                               Case No. 09-C-553

GRAPHIC COMMUNICATION CONFERENCE
INT'L BROTHERHOOD OF TEAMSTERS,
DISTRICT COUNCIL 1, LOCAL 77-P,

    Defendant.

## DECISION AND ORDER

In June 2006, facing productivity and cost concerns, Plaintiff Graphic Packaging International, Inc. (the "Company") decided to man its presses with two and one-half employees rather than the traditional three. The Defendant, the Local 77-P of the International Brotherhood of Teamsters (the "Union"), filed a grievance on behalf of its members. An arbitrator issued a ruling favorable to the union, and the Company brought this action challenging the arbitrator's award, and the Union moved for confirmation of the award along with sanctions against the Company. For the reasons given below, the arbitrator's award will be upheld and the motion for sanctions denied.

The Company and its represented employees were governed by a collective bargaining agreement ("CBA"). (Dkt. # 23, Ex. 2.) The parties were further governed by a local agreement applicable to the Company's Menasha plant. In the arbitration, both sides based their position at

least partly on Article VI of the local agreement, which is entitled "scheduling procedure." (Dkt. # 23, attachment 5.) That section contains a chart identifying the employee's seniority number to be scheduled for each shift and press. (*Id.* at Art. VI.) Both sides agree that Article VI indicates that three employees per shift – a press person, assistant press person, and a helper – are to be "scheduled" to work each press. But the section is silent as to whether that means an employee scheduled for a given press must work *only* on that press, or whether instead the Company may schedule an employee to work on (for example) two presses, which is what it did in June 2006 when it decided to staff presses with two and one-half employees rather than three. Under the new policy, a helper would be scheduled for two different presses at the same time and would rotate between them.

The arbitrator found the CBA ambiguous, but he concluded that a longstanding past practice established that the ambiguity should be resolved in favor of the Union. Long-time employees testified that there had always been three employees per press, and the Company did not dispute that. In addition, the parties had assumed in earlier negotiations that each press would be staffed by three employees. Accordingly, the arbitrator concluded that Article VI of the local agreement, in setting forth a three-employee-per-press policy, meant that those employees were to work *exclusively* on the assigned press. As such, he found that the Company violated the agreement between June 26, 2006, when the new practice went into effect, and March 6, 2009, the date of the decision. The arbitrator ruled that the Company must make restitution "equal to the additional hourly wages that would have been paid out if each press was manned by three people from June 2006 to the date of this Award." (Dkt. # 23, Ex. 3 at 11.)

**I. Analysis**

When parties agree to have their disputes decided in binding arbitration, as here, the arbitrator's award is not to be overturned lightly. A federal court is not acting as a "court of appeals" – it exercises its power only to ensure that the arbitrator's award was actually based on a good faith interpretation of the governing contract and not something wholly outside of the agreement, such as a personal or political motive.

> A reviewing court will enforce the arbitrator's award so long as it "draws its essence from the contract," even if the court believes that the arbitrator misconstrued its provisions. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 38 (1987). An arbitrator's decision draws its essence from the contract if it is based on the arbitrator's interpretation of the agreement, correct or incorrect though that interpretation may be. "[I]f an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." Thus, once we conclude that the arbitrator did in fact interpret the contract, our review is concluded. "[T]he question before a federal court is not whether the ... arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract."

*United Food and Commercial Workers, Local 1546 v. Illinois American Water Co.,* 569 F.3d 750, 754 -755 (7th Cir. 2009) (some citations omitted). The key question is whether the award "draws its essence" from the contract, and in determining whether that is the case courts resolve any reasonable doubts in favor of enforcing the award. *Polk Bros., Inc. v. Chicago Truck Drivers Union,* 973 F.2d 593, 597 (7th Cir.1992).

**A. The Violation**

Here, the Company argues that the arbitrator erred both in finding a violation and in calculating his award of damages, and as such his decision did not draw its essence from the bargaining agreement.

3

The Company admits that the local agreement says that a press person, assistant press person and helper must be scheduled for each press. But it argues that the agreement was not violated because there are still three men "scheduled" to work each press – it is just that the helper is now working on two presses rather than one.[1] Even though the helper is splitting his time between two presses, he is still "scheduled" to work on each of them, and that is all the agreement requires. The agreement says nothing requiring the employee scheduled for a given press to work exclusively on that press.

In addition, the Company argues that the arbitrator's ruling flies in the face of the Company's right to manage its staffing levels. Article VII of the CBA provides that "employees' daily and weekly schedule and shift assignment are based on operating requirements and subject to change based on product demand and operating efficiencies." (Dkt. # 23, Ex. 2 at 9.) That is exactly what happened here. The Company realized that it was not necessary to have a full helper position at every press because helpers were being underutilized and were typically taking substantial periods of break time every day. Thus, for "operating efficiencies" the Company modified the employees' assignments to deploy them more efficiently.

But saying that the employees' shift *assignments* are subject to change based on operating efficiencies is not the same as saying that the employer has the right to redefine how much work an employee must do when he is scheduled. That is, the CBA arguably allows the employer to change an employee's shift assignment – from first to third shift, for example – and it allows the employer

---

[1] The agreement does not even use the term "scheduled." The portion of the contract is entitled "scheduling procedure" and simply contains a chart listing the employees to be scheduled per press.

to change the employee's schedule. But it does not say that, once scheduled, the employer may change the amount of work the employee must do. The arbitrator concluded that a scheduled employee was one scheduled to work only on one press, and Article VII of the CBA is silent on that point. Accordingly, I am not persuaded that the arbitrator's award conflicts with any portions of the CBA.

More importantly, these are arguments that the arbitrator erred rather than arguments that the arbitrator's decision did not "draw its essence" from the CBA. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987). The arbitrator recognized that the local agreement indicated that three employees should be scheduled per press. But the local agreement did not indicate whether each scheduled employee must be exclusive to his assigned press, so he concluded the provision was ambiguous on that point. To resolve the ambiguity, he looked to past practice to discern what the agreement intended. The arbitrator thus explicitly based his award on his conclusion that the agreement was ambiguous and he found, in essence, that the agreement's scheduling provision meant that employees scheduled to a given press were exclusive to that press. This conclusion did not come from left field – it came from an interpretation of the agreement itself. The Company's argument that the decision conflicts with certain sections of the CBA is not a basis for reversal. "Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.,* 484 U.S. 29, 37- 38 (1987).

In addition, the fact that the arbitrator relied on extrinsic evidence does not mean the award did not draw its essence from the agreement. In *Jasper Cabinet Co.,* an arbitrator found a provision

5

ambiguous and then looked to past bargaining history and evidence of the parties' past practice. The arbitrator "looked at testimony regarding bargaining history; withdrawn Employer proposal[s] from the last negotiations; circumstantial evidence relating to the practices of the Employer which clearly demonstrate its lack of belief that overtime was mandatory; and the lack of contract language itself indicating mandatory overtime," and concluded "that the contract did not grant the employer the right to discipline employees for refusing to work overtime." *Jasper Cabinet Co. v. United Steelworkers of America, AFL-CIO-CLC, Upholstery and Allied Div.,* 77 F.3d 1025, 1030 (7th Cir. 1996). The Seventh Circuit found that the arbitrator's "comprehensive analysis illustrates that the arbitrator was engaged in interpretation of the agreement." *Id.* Here, the result is no different. This was not a case of the arbitrator imposing his own world view or his "notions of industrial justice" on the parties; the arbitrator was looking to past practice to give meaning to a provision he found ambiguous. *Misco,* 484 U.S. 29 at 38. His decision therefore drew its essence from the governing agreement.

*Tootsie Roll Industries,* on which the Company relies, is not to the contrary. *Tootsie Roll Industries, Inc. v. Local Union No. 1, Bakery, Confectionery,* 832 F.2d 81 (7th Cir. 1987). There, an arbitrator construed two ambiguous phrases in the applicable agreement. But he went beyond that by using evidence of the company's excused absence policy to, in effect, trump the plain language of the governing agreement. That agreement, a letter agreement applicable to a single employee with an unexcused absence problem, stated that the employee would be terminated if she was absent "for any reason whatsoever." *Id.* at 84. Reliance on a more lenient company practice would effectively undermine that agreement, and thus the court concluded that the arbitrator's decision did not draw its essence from the agreement because it actually contradicted it. *Tootsie*

6

*Roll Industries* is a stand-out case because the arbitrator's decision was not just "wrong" – it undermined the very purpose of the governing agreement, which was to allow the company to fire the employee for any absence, regardless of the company's general policy applicable to all *other* employees. "In fact, if the parties had intended the regular policy to apply, there would have been no reason for spelling out the very specific attendance requirements contained in the letter agreement and they would have written such language into the contract with specificity had they so intended." *Id.*

Here, the Company argues that *Tootsie Roll Industries* should apply because the arbitrator's decision contradicts portions of the CBA allowing the Company to staff presses based on work load, and it means employees will be able to have longer breaks than the local agreement provides due to decreased employee workloads if staffing levels are increased. It also argues that Article VI of the local agreement only applies to certain presses and cannot be used to define work schedules on other presses. But these are not arguments that the entire purpose of the CBA itself would be undermined, as in *Tootsie Roll Industries*. Instead, they are simply arguments that the arbitrator misinterpreted the CBA and the local agreement.

> What Clear Channel's argument boils down to is that the arbitrator's decision is contrary to the plain meaning of the contract; but this is simply another way of arguing that the decision is wrong on the merits, and that is precisely the type of argument that is beyond our purview. It bears repeating that our task in reviewing a labor arbitrator's award is to ensure that the arbitrator was interpreting the collective bargaining agreement, not that he was doing so correctly.

*Clear Channel Outdoor, Inc. v. International Unions of Painters and Allied Trades, Local 770,* 558 F.3d 670, 677 (7th Cir. 2009).

Here, the arbitrator's conclusion that the "scheduling procedure" set forth in Article VI meant that three employees must be scheduled per press drew its essence from the agreement. An award does not draw its essence from the collective bargaining agreement "only when the arbitrator must have based his award on some body of thought, or feeling, or policy, or law that is outside the contract." *Arch of Illinois v. District 12, United Mine Workers of America,* 85 F.3d 1289, 1292 (7th Cir.1996), *quoting Polk Bros. v. Chicago Truck Drivers Union,* 973 F.2d 593, 597 (7th Cir.1992). Although the Company argues that the arbitrator misinterpreted the contract, it has not explained what the decision was based upon apart from the contract. As such, the award must be upheld.[2]

**B. The Award of Damages**

The Company also vigorously challenges the arbitrator's award of damages. His award states that "The Company is ordered to make affected Union members whole. Financial restitution should be equal to the additional hourly wages that would have been paid out if each press was manned by three people from June 2006 to the date of this Award. [March 6, 2009]."

The Company argues that no employees had their hours reduced during this period, and there were no layoffs based on the new policy. Thus, the $850,000 in losses calculated by the Union would amount to a windfall to the employees because none of them ever missed out on work or lost any income. Because no employees lost any money as a result of the new policy, they need not be "made whole."

Deference is owed to an arbitrator's damages calculation. "As with an arbitrator's interpretation of a contract, we employ an extremely deferential standard of review to damages

---

[2]The Company also argues the arbitrator's decision conflicts with its inherent right to manage and determine appropriate staffing levels. But that "inherent right" to staff one's business can be bargained away, and that is what the arbitrator found happened here.

8

calculations." *Monee Nursery & Landscaping Co. v. International Union of Operating,* 348 F.3d 671, 678 (7th Cir. 2003). "[W]here it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect." *Misco,* 484 U.S. 29 at 38.

Here, the arbitrator's award indicates that the amount of restitution should be the amount of "additional hourly wages that would have been paid out if each press was manned by three people." (Dkt. # 23, Ex. 3 at 11.) That is, the arbitrator did not believe that employees worked reduced hours or that any employees lost their jobs; instead, he awarded "additional" hourly wages, which are those wages that would have been earned had the company stuck with its three-employee staffing levels. Even though employee hours were not *reduced*, the employees missed out (in theory, anyway) on the opportunity for extra hours of work because, in essence, the company made them work more efficiently. These additional hours were lost by virtue of the change from three to two and one-half employees per press. (Presumably that was exactly the point of the Company's staffing change – to eliminate employee hours it viewed as excessive and unnecessary.) While a Company cannot normally be faulted for seeking efficiencies, under the agreement (as interpreted by the arbitrator) the path it chose was foreclosed to it. The arbitrator's award is entitled to substantial deference. Although in some respects the award has the appearance of a windfall because the employees are being compensated for work they did *not* do, it is a reasonable award under the circumstances. In essence, the Company saved money by creating an efficiency its labor agreement did not allow, and the beneficiary of such efficiency should be the employees affected rather than the Company itself. The award was a product of the arbitrator's construction of the local agreement, and as such there is no basis for overturning it.

**C. Ex-Parte Communications**

The Company also argues that it is entitled to have the award vacated because the arbitrator based his decision in part on *ex parte* communications and did not consider the Company's arguments or evidence. Specifically, on March 24, 2009, the Union's president called the arbitrator to ask a question about the damages award. According to the Union, the arbitrator told him to put his question in writing, so he faxed the question to the arbitrator on the same day. The arbitrator then sent a copy of the question to the Company and asked that the Company respond before March 31. Apparently the Company believed that "before March 31" meant "on or before March 31," because it sent its response at 3:32 p.m. on March 31, after the arbitrator had already issued his clarification. In any event, the arbitrator's clarification was simply a brief restatement of the original award. (Dkt. # 23, Ex. 14.) After being peppered with additional follow-up questions from the Company, the arbitrator issued a terse "My award . . . is final" letter to the parties. It is clear from this record that the arbitrator did not consider new evidence or arguments after the award, and it is unclear why, having missed the deadline, the Company now believes some sort of unspecified injustice occurred. In short, despite the Company's focus on post-award communications, there is no basis in the record to conclude that anything of even appreciable significance occurred after the arbitrator issued his award.

**D. Sanctions**

The Union also moved for sanctions against Plaintiff's counsel on the grounds that this action is frivolous and without a reasonable basis in either law or fact. *See* Fed. R. Civ. P. 11(b)(2). The Seventh Circuit has recognized that sanctions may be particularly appropriate in arbitration challenges because the challenge itself undermines many of the benefits of agreeing to arbitration

10

in the first place. Post-arbitration litigation adds delay and significant cost, two of the principal evils arbitration attempts to cure.

> Not only do we have to consider the general Rule 11 sanction principles in this case, but we must also consider the long line of Seventh Circuit cases that have discouraged parties from challenging arbitration awards and have upheld Rule 11 sanctions in cases where the challenge to the award was substantially without merit. . . . The precedent is clear and emphatic and directs us to uphold sanctions in a broad spectrum of arbitration cases.

*Cuna Mut. Ins. Soc. v. Office and Professional Employees Intern. Union, Local 39,* 443 F.3d 556, 561 (7th Cir. 2006).

I am satisfied that an award of sanctions is not necessary to deter and punish any improper behavior under the circumstances of this case. *See* Fed. R. Civ. P. 11(c)(4). Most importantly, the clause at issue here – or, rather, the chart in Article VI showing employee scheduling – is truly an ambiguous provision. Although the arbitrator's interpretation of the chart must be upheld, I am doubtful that the parties to the negotiations ever dreamed that a mere chart listing "scheduling procedure" would take on the crucial importance now ascribed to it. It would have been far more efficacious to simply draft a sentence stating that "Presses shall be operated by three employees at all times." In any event, the unusual nature of the dispute and the magnitude of the damage award, despite the fact that no employees had their hours reduced or were laid off, suggests that the action is not frivolous. Accordingly, the request for sanctions will be denied.

**II. Conclusion**

For the reasons given above, I find no basis to overturn the decision of the arbitrator. The Union's motion for summary judgment is **GRANTED** and the Company's is **DENIED**. The

11

motion for sanctions is **DENIED**. The Clerk is directed to enter judgment confirming the award of the arbitrator.

**SO ORDERED** this   13th   day of September, 2010.

s/ William C. Griesbach  
William C. Griesbach  
United States District Judge